******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ANGEL MELETRICH *v.* COMMISSIONER OF
CORRECTION
(AC 38418)

Lavine, Elgo and Beach, Js.

*Syllabus*

The petitioner, who had been convicted of the crimes of robbery in the first
degree, conspiracy to commit robbery in the first degree, larceny in the
first degree, and conspiracy to commit larceny in the first degree, sought
a writ of habeas corpus. He claimed, inter alia, that his trial counsel
provided ineffective assistance by failing to present the testimony of
the petitioner's aunt, G, as an alibi witness at the criminal trial. The
petitioner's conviction stemmed from a robbery that took place at a
fast-food restaurant, in which three men with concealed faces entered
the restaurant through a side door. One of the employees of the restau-
rant, B, admitted to the police that she was involved in the robbery and
claimed that before she went to work she had met the petitioner and
another person, who asked her to leave the door open at closing time so
that they could rob the restaurant. The habeas court rendered judgment
denying the petition and, thereafter, denied the petition for certification
to appeal, and the petitioner appealed to this court. *Held*:

1. The habeas court did not abuse its discretion in denying the petition for
   certification to appeal with respect to the petitioner's claim that his trial
   counsel had rendered ineffective assistance by failing to call G as an
   additional alibi witness during the criminal trial, as the petitioner failed
   to demonstrate that his trial counsel's performance was deficient or
   that he was prejudiced by his trial counsel's decision, and a resolution
   of the claim did not involve an issue that was debatable among jurists
   of reason.

2. The habeas court did not err in concluding that the petitioner's trial
   counsel was not deficient in failing to call G to testify: although G
   testified that the petitioner was home at the time of the robbery and
   when he was alleged to have met with B to discuss his plan to rob the
   restaurant, it was clear that G was not with the petitioner every moment,
   the jury reasonably could have inferred, given the close proximity of
   the restaurant, that the petitioner could have left G's house to confront
   B on her way to work without G's knowledge, G's testimony would have
   been cumulative of the testimony of D that she had been with the
   petitioner every moment during the time period of the robbery and
   beforehand, and trial counsel testified at the habeas trial that, following
   an investigation, he had determined that D could provide the best alibi
   because she could cover the petitioner's whereabouts at the time of the
   robbery; moreover, the petitioner was not prejudiced by the failure of
   his trial counsel to call G as a witness, as G's testimony was cumulative
   and did not provide the petitioner with an airtight alibi, G was not an
   entirely neutral and disinterested witness, the jury could have found
   that the petitioner had conspired about the robbery at a time prior to
   when he was with D at G's house, and, therefore, this court's confidence
   in the verdict was not undermined by the failure of trial counsel to
   present G's testimony.

Argued September 8—officially released November 28, 2017

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland, and tried to the court, *Fuger, J.*; judgment
denying the petition; thereafter, the court denied the
petition for certification to appeal, and the petitioner
appealed to this court. *Appeal dismissed.*

*Matthew C. Eagan*, assigned counsel, with whom
were *Michael S. Taylor*, assigned counsel, and, on the

brief, *Emily Graner Sexton*, assigned counsel, for the appellant (petitioner).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Lisa Maria Proscino*, former special deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Angel Meletrich, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal and erred in not finding that his trial counsel provided ineffective assistance by failing to call the petitioner's aunt as an additional alibi witness during the petitioner's criminal trial. We disagree and, accordingly, dismiss the appeal.

As recited by the habeas court, the facts which the jury reasonably could have found concerning the petitioner's underlying conviction are as follows: "[T]he petitioner was charged with one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134, one count of larceny in the first degree in violation of General Statutes [Rev. to 2007] § 53a-122 (a) (2), and one count of conspiracy to commit larceny in the first degree in violation of . . . § 53a-48 and [General Statutes (Rev. to 2007) §] 53a-122. The petitioner, represented by Attorney Claud Chong, proceeded to a jury trial. The jury returned verdicts of guilty on all counts, finding the petitioner guilty of counts one and three as a coconspirator on the theory of vicarious liability. The petitioner appealed from the judgment of conviction; however, the appeal was withdrawn. . . .

"On Wednesday, November 21, 2007, the day before Thanksgiving, the McDonald's restaurant near the New Brite Plaza area of New Britain had been open for business. The public could enter and exit the restaurant from two doors, one at the front of the building and the other on the side, that are unlocked during business hours and are locked when the restaurant is closed. The side door latch did not work properly and tape was placed over the latch to allow the door to open during business hours. At the end of the day, when the side door needed to be secured, the tape would be removed so that the latch would prevent the door from opening.

"Shortly before midnight, when both the inside of the restaurant and the drive-through window stopped transacting business, the employees then on-site prepared to close the restaurant. Among those employees were Assistant Manager Angel Echevarria and Bethza Meletrich. Echevarria's responsibilities at closing included collecting the eight cash register drawers in a safe located in a small office in the back of the restaurant. The proceeds from the day's sales, gift cards, coupons, the register drawers themselves with $100 of start-up money for the next business day and any other valuables would be secured in the safe. The cash pro-

ceeds from sales and gift cards were placed in bank deposit bags and then secured inside the back office safe.

"Although it was normally Echevarria's responsibility to lock the two outside doors, on the evening of November 21, 2007, he was training another manager to count the money in the registers and asked Bethza Meletrich to lock the two outside doors. Although Bethza Meletrich initially locked both doors, which involved removing the tape on the side door's latch, she returned to replace the tape on the side door latch. One of the restaurant's surveillance cameras shows Bethza Meletrich on her cell phone as she walked past the registers to the side door. Shortly thereafter, Bethza Meletrich walked past the registers again, and then three men, later described by Echevarria as being light skinned and of normal height and average size, who were dressed in dark hooded sweatshirts with the hoods pulled over their heads, and whose faces were concealed by dark ski masks, entered the McDonald's restaurant through the side door and made their way to the back office.

"Two of the men brandished handguns, one chrome with a wooden handle and the other black. One of the men called Echevarria by his nickname, Sidio, a name either uncommon or unique to Echevarria, but known to employees of the McDonald's, including Bethza Meletrich. After one of the men asked Echevarria where the money was located, he told them in the office safe. One of the robbers stacked either seven or eight of the register drawers and carried the stack, described by Echevarria as heavy and difficult to carry, out of the restaurant. Echevarria called 911 after the three men exited the restaurant and then went to the side door and observed a car driving away. Three of the surveillance cameras in the restaurant captured footage of the robbery.

"The police responded to the restaurant and began their investigation, which included interviewing all employees. Although Bethza Meletrich initially denied any involvement, she later gave a statement to New Britain police officers admitting her involvement in the robbery. In her statement, dated November 26, 2007, Bethza Meletrich indicated that she met Adam [Marcano] and the petitioner, whose nickname was 'Rome' or 'Romeo,' before she went to work. They asked her to leave the door open at closing time so that they could rob the restaurant. According to Bethza Meletrich, she was first offered money for her cooperation, which she declined, and then her two cousins threatened her and/or her girlfriend. Bethza Meletrich informed the police that the petitioner was armed with a silver gun that had a brown handle, which he displayed to her while it was tucked into his waistband. The petitioner and Adam Marcano, accompanied by a third person unknown to Bethza Meletrich, entered the restaurant shortly before

midnight through the side door she had left unlocked.

"Also on November 26, 2007, the police executed a search warrant for one of the apartments in, as well as the basement of, 20 Acorn Street, New Britain, a multifamily dwelling approximately six blocks, or less than one mile, from the [McDonald's] restaurant that was robbed. The petitioner was at the apartment when the police executed the search warrant. Although the Marcano brothers were not present at that time, the police found items belonging to both Adam and Anthony Marcano in the apartment. The police investigation determined that the petitioner and both Marcano brothers lived at 20 Acorn Street on the first floor.

"The police also found three black hooded sweatshirts in the apartment. After gaining access to the basement from the apartment, the police searched the basement and found: two money deposit bags, one of which contained several rolls of coins and loose quarters; a plastic bag containing three black ski masks, one pair of black fleece gloves and one pair of brown knit gloves; and three cash register drawers, one of which contained a McDonald's coupon. Subsequently, in January, 2008, the police received a phone call from the landlord of 20 Acorn Street apprising the police that other items had been found concealed under a subfloor of the basement. The police returned to 20 Acorn Street and seized five additional cash register drawers, one of which had a McDonald's sticker on it, that had been concealed under the subfloor.

"Forensic evidence recovered included [fingerprints] and palm prints from the plastic bag that contained the masks and gloves, as well as DNA from two of the ski masks. Three of the fingerprints—the right index, the right thumb, and the left thumb—were identified as belonging to Anthony [Marcano]. A DNA sample obtained from the petitioner allowed a comparison to [be] made with DNA from two of the masks. One mask interior had DNA from at least three individuals; the petitioner was determined to be a contributor to that DNA profile. As to this mask . . . an individual could be included statistically in this profile at the ratio of 1 in 120,000 African-Americans, 1 in 69,000 Caucasians and 1 in 66,000 Hispanics. A DNA sample from another mask's exterior had DNA from at least four individuals; the petitioner was determined to be a contributor to that DNA profile. As to that mask . . . an individual could be included statistically in this profile at the ratio of 1 in 390 African-Americans, 1 in 120 Caucasians and 1 in 170 Hispanics. . . .

"The state contended that the petitioner was guilty of the robbery and larceny in the first degree charges either as a principal offender or as an accessory to another participant in the crime. Additionally, the court instructed the jury on the robbery and larceny in the first degree charges as to the theory of vicarious liabil-

ity. Thus, if the jury found beyond a reasonable doubt that the state had proven all elements of the conspiracy to commit robbery and larceny in the first degree charges, but that the state had not proven that the petitioner was a principal or accessory as [to] the robbery and larceny charges in counts one and three, then the jury could consider whether the petitioner was criminally liable for the criminal acts of the other [coconspirators] under vicarious liability. The jury was charged accordingly.

"The jury returned guilty verdicts on all counts. Specifically, the jury found the petitioner guilty of both the robbery and larceny in the first degree charges as a [coconspirator] under the theory of vicarious liability. . . .

"The court, *Espinosa*, *J.*, sentenced the petitioner on February 5, 2010 [to a] . . . total effective sentence on all counts [of] twenty-three years of incarceration, followed by five years of special parole. The petitioner appealed from the judgment of conviction, but withdrew the appeal." (Footnotes omitted.)

In his seven count petition for a writ of habeas corpus, filed October 28, 2014, the petitioner claimed, inter alia, that Chong rendered ineffective assistance by, inter alia, failing to present the testimony of Guillermina Meletrich,[1] the petitioner's aunt, at the petitioner's criminal trial.

The petitioner's habeas trial began on February 9, 2015. In its memorandum of decision of August 18, 2015, the habeas court denied the petition for a writ of habeas corpus on all counts. The petitioner then filed a petition for certification to appeal from the court's judgment, which the court denied. This appeal followed. Additional facts will be discussed as necessary.

I

The petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal from the denial of his habeas petition claiming ineffective assistance of counsel. Specifically, he argues that because the issue is debatable among jurists of reason, a court could resolve the issue differently, and, therefore, the habeas court abused its discretion in denying his petition for certification to appeal. We disagree.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an

abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . To prove that the denial of his petition for certification to appeal constituted an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Citations omitted; internal quotation marks omitted.) *Sanders* v. *Commissioner of Correction*, 169 Conn. App. 813, 821–22, 153 A.3d 8 (2016), cert. denied, 325 Conn. 904, 156 A.3d 536 (2017).

As we discuss more fully in part II of this opinion, we disagree with the petitioner's claim that Chong performed deficiently by failing to call Guillermina Meletrich as an additional alibi witness during the petitioner's criminal trial; nor was the petitioner prejudiced by Chong's decision. Because the resolution of the petitioner's claim does not involve an issue that is debatable among jurists of reason, we conclude that the habeas court did not abuse its discretion in denying certification to appeal from the denial of the petition for a writ of habeas corpus.

II

We turn to the questions of whether Chong performed deficiently by failing to call Guillermina Meletrich as an additional alibi witness during the petitioner's criminal trial, and thereby prejudiced the defense. We agree with the habeas court.[2]

"We begin with the standard of review applicable to this claim. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 686, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], [our Supreme Court] has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. . . . The claim will succeed only if both prongs are satisfied." (Citation omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 537–38, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016).

At the habeas trial, Guillermina Meletrich testified that she arrived home at 4:30 p.m., on November 21, 2007, and that the petitioner and his girlfriend[3] were there when she arrived. She stated that she knew that he did not leave the house that day "[b]ecause every time I came in he was there . . . ." When asked if she would have testified at the petitioner's criminal trial, she stated, "They had asked me once to testify if he was at my house that day . . . and I said he was, but they never called me." When asked if she would have testified as she did at the habeas trial, she said, "Yes, because it's the truth. He was home."

In its memorandum of decision, the habeas court made the following findings: "[Guillermina] Meletrich testified that the petitioner and his girlfriend were at the house when the robbery was committed. Given that the jury found the petitioner guilty as a coconspirator under the theory of vicarious liability, the petitioner did not need to be at or near the McDonald's restaurant when the robbery was committed. Therefore, the evidence presented by [Guillermina] Meletrich in the habeas proceeding does not show deficient performance by . . . Chong for failing to present her testimony to the jury, nor that the petitioner was prejudiced thereby." The habeas court made no findings as to whether Guillermina Meletrich was credible.

The petitioner argues on appeal that the habeas court incorrectly concluded that Chong's failure to call Guillermina Meletrich as an additional alibi witness did not amount to ineffective assistance. The petitioner contends that the court erred in its findings regarding Guillermina Meletrich's testimony, because her testimony provided an alibi for not only the time of the actual robbery, but also for the time when, according to Bethza Meletrich, the petitioner and Adam Marcano presented the plan to her at the park. The petitioner claims that this testimony, therefore, would have established a full alibi for not only the actual robbery, but also for the

conspiracy to commit the robbery, as well, because Bethza Meletrich's testimony was the only direct testimony linking the petitioner to the conspiracy.

Having thoroughly reviewed the record, we conclude that even if the habeas court had credited Guillermina Meletrich's testimony such that the petitioner could not have confronted Bethza Meletrich in the park, Chong was still not constitutionally ineffective in failing to present Guillermina Meletrich's testimony. Chong had no compelling reason to call her, and we are also not persuaded that the outcome would have been different if her testimony had been presented.

### A

"To prove his or her entitlement to relief pursuant to *Strickland*, a petitioner must first satisfy what the courts refer to as the performance prong; this requires that the petitioner demonstrate that his or her counsel's assistance was, in fact, ineffective in that counsel's performance was deficient. To establish that there was deficient performance by petitioner's counsel, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. . . . A reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance. . . . The range of competence demanded is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . .

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . In reconstructing the circumstances, a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Citations omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 538–39.

"The failure of defense counsel to call a potential

defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it." *State* v. *Talton*, 197 Conn. 280, 297–98, 497 A.2d 35 (1985). Where an alibi defense contains omissions for crucial time periods, the alibi is insufficient, and it is not deficient performance to fail to present that defense. See *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 701–702, 89 A.3d 426 (2014), appeal dismissed, 321 Conn. 765, 138 A.3d 278, cert. denied sub nom. *Jackson* v. *Semple*, U.S. , 137 S. Ct. 602, 196 L. Ed. 2d 482 (2016). "[W]here the [new] evidence merely furnishes an additional basis on which to challenge [previously admitted evidence, the credibility of which] has already been shown to be questionable . . . the [new] evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." (Internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 787, 138 A.3d 908 (2016).

"We [note] that our review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. . . . Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken. . . .

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . . Further, we generally have upheld an attorney's choice to call certain witnesses instead of others. . . ." (Citations omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 540–42.

"We recognize, however, that there have been instances when our Supreme Court and this court have held that an attorney's failure to call specific witnesses was deficient performance." Id., 542. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 516–20, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009); *Vazquez* v. *Commissioner of Correction*, 107 Conn.

App. 181, 185–87, 944 A.2d 429 (2008); *Siano* v. *Warden*, 31 Conn. App. 94, 104–105, 623 A.2d 1035, cert. denied, 226 Conn. 910, 628 A.2d 984 (1993).

"Finally, we turn to the legal principles governing our review of the proffered testimony of the petitioner's alibi witnesses. Our Supreme Court has clarified that in Connecticut, the crux of the alibi defense is to create a reasonable doubt as to key elements of the state's case. [A]lthough an alibi is sometimes spoken of as a defense, it operates, in this state, to entitle an accused to an acquittal when he has so far proved his alibi that upon all the evidence a reasonable doubt of his guilt has been raised. . . . Circumstantial evidence can be used to support, or disprove, an alibi defense. . . .

"[A]bsent a sufficient tactical reason, the failure to call an alibi witness can constitute deficient performance. . . . Where the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question, however, a failure to present certain alibi witnesses has been upheld as reasonable under the circumstances." (Citations omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 544–46.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012).[4]

The following facts from the petitioner's habeas and criminal trials are pertinent to our analysis. At the petitioner's habeas trial, the petitioner testified that he told Chong that he had several alibi witnesses, including Guillermina Meletrich and Christina Diaz. Chong testified that he could not "recall the names of the relatives, but [he] did speak to a number of the relatives . . . ." He did "recall speaking to an aunt who lived at [20 Acorn Street]," but could not recall specific names. When asked if he recalled speaking to an aunt who said the petitioner was home during the day and evening of the robbery, Chong said, "It's possible, but again . . . as to specific conversations, I don't recall." After being presented with a police report, Chong said, "Again, I don't remember names, but I do remember, prior to trial, during the course of conducting the investigation, I—myself and my investigator did speak to a number of family members and friends . . . ." He continued, "A number of family and friends were staying at that residence in New Britain, and we spoke with a number of family and friends to establish an alibi for [the peti-

tioner]. . . . I . . . recall that a girlfriend claimed that she was in bed with [the petitioner] at the time of the McDonald's . . . robbery, and she in fact testified at the trial to provide an alibi defense. I'm sure I spoke to other relatives, but it was my judgment at the time that she would provide the best testimony with respect to his whereabouts at the time of the robbery." When questioned about whether having additional alibi witnesses would have bolstered the defense of the petitioner, Chong could not answer, stating it required speculation, and he reiterated that "after interviewing a number of family members and friends who were at the residence, people were coming and going and family . . . members could not account for his presence every hour, every minute of the day and night. The only person who could testify in my judgment and provide the strongest testimony was the girlfriend who said . . . that she was in bed with him at the . . . specific time that the robbery occurred . . . ." After being asked again if presenting additional alibi witnesses would have helped, Chong again could not answer, and the habeas court intervened, calling the petitioner's habeas counsel argumentative. Chong then said that he remembered an aunt who said the petitioner was at the house the day of the robbery, but could not account for his whereabouts within the specific time frame of the robbery's commission. When asked if he knew what time Guillermina Meletrich could provide an alibi for, Chong stated, "No, no. It's . . . important to understand . . . that . . . the McDonald's restaurant was within a five minute drive from the home."

The criminal trial record reflects that Christina Diaz did testify as an alibi witness for the petitioner. She testified that she arrived at 20 Acorn Street on November 21, 2007, during daylight hours, and was with the petitioner for every moment. She said he did not leave the house, and that she did not recall him slipping out.

On all the evidence and facts found by the court, we conclude that Chong's representation was not deficient by failing to call Guillermina Meletrich as an alibi witness. Although Guillermina Meletrich testified that the petitioner was home the entire time from 4:30 p.m. onward, it was also clear that she was not with him every moment of that time frame. She said, "[e]very time I came in he was there," implying, of course, that there were times when she was not physically with him. Given the close proximity of the McDonald's, as evidenced by Chong's testimony at the habeas trial and Bethza Meletrich's testimony at the criminal trial, it would have been reasonable for the jury to infer that the petitioner could have left the house to confront Bethza Meletrich on her way to work without Guillermina Meletrich's knowledge.

Guillermina Meletrich's testimony also would have been cumulative of that of Diaz. Diaz testified at the

criminal trial that she had been with the petitioner every moment from the time she arrived until after the robbery. Guillermina Meletrich stated that Diaz was with the petitioner when she came to see him. Finally, Chong, who did not remember every detail, testified nonetheless that he or his investigator interviewed several friends and family members and thought Diaz could provide the best alibi because she could cover the petitioner's whereabouts at the time of the robbery. Diaz testified at the criminal trial that she was with the petitioner continuously from before sunset, which necessarily covered the time when Bethza Meletrich, according to her testimony, was confronted by the petitioner and Adam Marcano. We conclude that the petitioner has not shown that Chong's investigation and trial strategy were deficient by reason of his not presenting cumulative testimony that would have been less comprehensive than that of Diaz.[5]

B

To prevail on a claim of ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice; a failure to prove either deficient performance or prejudice is fatal to his or her claim. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510. Although we have determined that the habeas court did not err in finding that the petitioner did not prove deficient performance by Chong, we also find that the habeas court did not err in finding that his performance did not satisfy the prejudice prong of *Strickland*. See *Strickland* v. *Washington*, supra, 466 U.S. 691–96.

"Our analysis of the prejudice prong requires us to determine the probable effect that counsel's alleged defective performance had under the circumstances of the case before the court. Thus, [t]o satisfy [this] prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. . . . The likelihood of a different result must be substantial, not just conceivable. . . .

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury. Some of the factual findings will have been unaffected by the errors, and factual

findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [I]n assessing whether there is a substantial likelihood that the addition of such evidence would have resulted in a different outcome, we must consider the cumulative effect of all of the evidence. . . .

"[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Citations omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 565–66.

As discussed in part II A of this opinion, Guillermina Meletrich's testimony was cumulative of that provided by Diaz at the criminal trial. We are not persuaded that the addition of Guillermina Meletrich's testimony would have reasonably affected the jury's verdict. Among other considerations, neither witness was entirely neutral and disinterested. See *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 518 ("in circumstances that largely involve a credibility contest . . . the testimony of neutral, disinterested witnesses is exceedingly important" [internal quotation marks omitted]).

Furthermore, Guillermina Meletrich's testimony did not provide the petitioner with an airtight alibi, even as to the time Bethza Meletrich was approached in the park. More critically, the jury could have believed Diaz' testimony to the effect that the petitioner was in the house with her from when she arrived, and the petitioner still could have conspired to commit the robbery; the plan could have been devised at an earlier time and executed later.[6] Bethza Meletrich testified that the petitioner and Adam Marcano approached her with a preformed plan; the jury reasonably may have inferred that the petitioner and Adam Marcano formed their plan prior to the confrontation with Bethza Meletrich. Thus, our confidence in the verdict has not been undermined by the failure to present Guillermina Meletrich's testimony.

In summary, the petitioner is unable to demonstrate that he was prejudiced by Chong's failure to call Guillermina Meletrich as an alibi witness. Consequently, as he has failed to demonstrate either deficient performance

or prejudice, the petitioner's claim of ineffective assistance of counsel must fail. In light of the foregoing, the habeas court did not abuse its discretion in denying the petition for certification to appeal for this claim.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The petition for a writ of habeas corpus and the habeas court's memorandum of decision refer to her as "Guiellermo," but the habeas trial transcripts and the petitioner's appellate brief spell the name "Guillermina." She is also sometimes referred to as "Gigi." We will refer to her as "Guillermina" throughout this opinion.

[2] The habeas court considered and rejected a number of claims brought by the petitioner. The claim regarding the failure to call Guillermina Meletrich is the only claim pursued on appeal. We note that the habeas court devoted only six lines in its memorandum of decision to the analysis of this issue. To the extent that the habeas court's precise reasoning does not appear in the record, we presume that the court's reasoning was correct. See *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 773, 646 A.2d 790 (1994) ("to the extent that the trial court's memorandum of decision may be viewed as ambiguous . . . we read an ambiguous record, in the absence of a motion for articulation, to support rather than to undermine the judgment").

[3] The "girlfriend" referred to is Christina Diaz, who in the petitioner's criminal trial, testified as an alibi witness and referred to herself as the petitioner's ex-wife.

[4] We note as well that appellate courts, and habeas courts, are not necessarily compelled to reach a conclusion of ineffective deficient performance if trial counsel has not called as a witness a person who can provide useful information. See *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 302–304, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009) (counsel not ineffective for failing to call alibi witness when witness was not strong and others were available). Experienced trial counsel are well aware that virtually every witness has vulnerabilities, or would provide information on cross-examination that could favor his opponent. See *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 637–38, 126 A.3d 558 (2015) (counsel not ineffective for failing to call "highly credible" expert witness because his "opinion would have been vulnerable to attack on various grounds"). As a criminal defendant is protected to a degree by the burden of proof, a choice not to call witnesses who are not crucial may be wise. See *Harrington* v. *Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the [s]tate's theory for a jury to convict").

[5] We note that the petitioner has asserted that the court's factual finding was erroneous in stating that Guillermina Meletrich "testified that the petitioner and his girlfriend were home with her at the time of the robbery," and in concluding that because the petitioner was convicted as a coconspirator, "the petitioner did not need to be at or near the McDonald's restaurant when the robbery was committed." The petitioner claims that this finding shows that the court mistakenly found that the aunt's alibi testimony did not cover the time that Bethza Meletrich was confronted in the park. A more accurate characterization is that the court was simply silent as to the time when Bethza Meletrich was confronted. Even were we to accept the petitioner's claim of factual error, we nonetheless would not conclude that Chong's performance was deficient, for reasons previously stated.

Additionally, the claim that the petitioner could not have been a coconspirator if he did not confront Bethza Meletrich in the park is not persuasive. We discuss the issue more fully in part II B of this opinion.

[6] The prohibited act in the conspiracy context is the agreement, not the substantive crime. See, e.g., *State* v. *Pond*, 315 Conn. 451, 472–75, 108 A.3d 1083 (2015). The petitioner asserts that the only evidence of the timing of the agreement indicates that the agreement was made when the plan was announced to Bethza Meletrich in the park. There is no logical reason, however, why the jury could not have fully believed Diaz—and thus Guillermina Meletrich's information would have had no additional value—and also have found that the petitioner agreed at a prior time to commit the robbery. This inference is supported by the charges brought against the petitioner at his criminal trial. The information charged the petitioner with four counts,

each of which occurred "on *or about*" the date of the robbery, which means the conspiracy did not have to form precisely during Bethza Meletrich's walk to work for the jury to find the petitioner guilty. (Emphasis added.)

———————————————————