******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## ANGEL MELETRICH *v.* COMMISSIONER
## OF CORRECTION
## (SC 20075)

McDonald, D'Auria, Mullins, Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

The petitioner, who had been convicted of certain crimes in connection with a robbery, sought a writ of habeas corpus, claiming, inter alia, that his trial counsel had rendered ineffective assistance by failing to present alibi testimony from the petitioner's aunt, G. The robbery occurred at a restaurant located less than one mile from the petitioner's house. The petitioner's cousin, B, who worked at the restaurant, informed the police that, before she went to work one day, the petitioner and another cousin had told her to leave a side door unlocked after closing so that they could rob the restaurant. B complied, and the restaurant was later robbed by three men wearing sweatshirts and ski masks. During the petitioner's criminal trial, the state introduced evidence that the police had searched the petitioner's home and seized, inter alia, sweatshirts and ski masks that purportedly had been used during the robbery and cash register drawers from the restaurant. In order to establish an alibi, trial counsel presented testimony from the petitioner's girlfriend, D, indicating that the two had spent the entire day and night in question together at the petitioner's house. The jury ultimately returned a verdict finding the petitioner guilty of first degree robbery and larceny, as well as conspiracy to commit first degree robbery and larceny, and the trial court rendered judgment in accordance with the verdict. During the habeas trial, G testified that she lived in the same house as the petitioner and that she had seen him there periodically throughout the day in question. The petitioner's trial counsel testified during the habeas trial that he had interviewed a number of relatives, including G, in preparing an alibi defense and that, in his judgment, D was the strongest witness because she could testify that she and the petitioner were together in bed when the robbery occurred. The habeas court rendered judgment denying the habeas petition and thereafter denied the petitioner's petition for certification to appeal. The petitioner then appealed to the Appellate Court, which dismissed the petitioner's appeal. On the granting of certification, the petitioner appealed to this court. *Held* that the Appellate Court correctly concluded that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal, this court having concluded that the petitioner's claim that trial counsel had rendered ineffective assistance by failing to call G as an alibi witness was not debatable among jurists of reason; trial counsel's strategic decision to present an alibi defense only through D's testimony, which was entitled to deference, did not constitute deficient performance because G would not have been able to account sufficiently for the petitioner's whereabouts for the entire day and evening in question, as G was able to provide only general testimony that the petitioner had been home at various points during the relevant time periods, and, given the close proximity of the restaurant, G may not have noticed the petitioner leaving the house to confront B about leaving a door unlocked or to participate in the robbery, whereas D's testimony, if credited, would have provided a complete alibi for the petitioner at the time of both of those events.

Argued February 20—officially released August 6, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Fuger, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, *Lavine, Elgo* and

*Beach, Js.*, which dismissed the appeal, and the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (petitioner).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, *Jo Anne Sulik*, supervisory assistant state's attorney, and *Lisa Maria Proscino*, former special deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

MULLINS, J. The principal issue in this appeal is whether the petitioner, Angel Meletrich, has demonstrated that his criminal trial counsel rendered ineffective assistance by failing to present the testimony of a second alibi witness to support his defense. The petitioner appeals from the judgment of the Appellate Court dismissing his appeal from the judgment of the habeas court, which denied his amended petition for a writ of habeas corpus. The petitioner claims that the Appellate Court incorrectly concluded that the habeas court acted within its discretion in denying certification to appeal because he established that his counsel had performed deficiently by failing to call a second alibi witness and, further, that had that witness testified, there is a reasonable probability that the outcome of the petitioner's criminal trial would have been different. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The Appellate Court's decision in *Meletrich* v. *Commissioner of Correction*, 178 Conn. App. 266, 174 A.3d 824 (2017), sets forth the relevant facts and procedural history of the petitioner's underlying criminal case. "[T]he petitioner was charged with one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134, one count of larceny in the first degree in violation of [General Statutes (Rev. to 2007)] § 53a-122 (a) (2), and one count of conspiracy to commit larceny in the first degree in violation of . . . § 53a-48 and [General Statutes (Rev. to 2007) § 53a-122]. The petitioner, represented by Attorney Claud Chong, proceeded to a jury trial. The jury returned [a verdict] of guilty on all counts, finding the petitioner guilty [on the counts alleging robbery in the first degree and larceny in the first degree under a] theory of vicarious liability." Id., 268.

"On Wednesday, November 21, 2007, the day before Thanksgiving, the McDonald's restaurant near the New Brite Plaza area of New Britain had been open for business. . . .

"Shortly before midnight, when both the inside of the restaurant and the drive-through window stopped transacting business, the employees then on site prepared to close the restaurant. Among those employees were Assistant Manager Angel Echevarria and Bethza Meletrich. Echevarria's responsibilities at closing included collecting the eight cash register drawers in a safe located in a small office in the back of the restaurant. . . . The cash proceeds from sales [were] then secured inside the back office safe.

"Although it was normally Echevarria's responsibility to lock the two outside doors, on the evening of Novem-

ber 21, 2007, he was training another manager to count the money in the registers and [Echevarria] asked Bethza Meletrich to lock the two outside doors. Although Bethza Meletrich initially locked both doors . . . she returned [and unlocked them]. One of the restaurant's surveillance cameras shows Bethza Meletrich on her cell phone as she walked past the registers to the side door. Shortly thereafter, Bethza Meletrich walked past the registers again, and then three men, later described by Echevarria as being light skinned and of normal height and average size, who were dressed in dark hooded sweatshirts with the hoods pulled over their heads, and whose faces were concealed by dark ski masks, entered the McDonald's restaurant through the side door and made their way to the back office.

"Two of the men brandished handguns, one chrome with a wooden handle and the other black. One of the men called Echevarria by his nickname, Sidio, a name either uncommon or unique to Echevarria, but known to employees of the McDonald's, including Bethza Meletrich. After one of the men asked Echevarria where the money was located, he told them in the office safe. One of the robbers stacked either seven or eight of the register drawers and carried the stack . . . out of the restaurant. Echevarria called 911 after the three men exited the restaurant and then went to the side door and observed a car driving away. Three of the surveillance cameras in the restaurant captured footage of the robbery.

"The police responded to the restaurant and began their investigation, which included interviewing all employees. Although Bethza Meletrich initially denied any involvement, she later gave a statement to New Britain police officers admitting her involvement in the robbery. In her statement, dated November 26, 2007, Bethza Meletrich indicated that she met Adam [Marcano] and the petitioner,[1] whose nickname was Rome or Romeo, before she went to work.[2] They asked her to leave the door open at closing time so that they could rob the restaurant. According to Bethza Meletrich, she was first offered money for her cooperation, which she declined, and then her two cousins threatened her [and] her girlfriend. Bethza Meletrich informed the police that the petitioner was armed with a silver gun that had a brown handle, which he displayed to her while it was tucked into his waistband. The petitioner and Adam Marcano, accompanied by a third person unknown to Bethza Meletrich, entered the restaurant shortly before midnight through the side door she had left unlocked.

"Also on November 26, 2007, the police executed a search warrant for one of the apartments in, as well as the basement of, 20 Acorn Street, New Britain, a multifamily dwelling approximately six blocks, or less than one mile, from the [McDonald's] restaurant that was robbed. The petitioner was at the apartment when

the police executed the search warrant. Although [Adam] Marcano [and his brother, Anthony Marcano] were not present at that time, the police found items belonging to both [of them] in the apartment. The police investigation determined that the petitioner and both Marcano brothers lived at 20 Acorn Street on the first floor.

"The police also found three black hooded sweatshirts in the apartment. After gaining access to the basement from the apartment, the police searched the basement and found two money deposit bags, one of which contained several rolls of coins and loose quarters; a plastic bag containing three black ski masks, one pair of black fleece gloves and one pair of brown knit gloves; and three cash register drawers, one of which contained a McDonald's coupon. Subsequently, in January, 2008, the police received a phone call from the landlord of 20 Acorn Street apprising the police that other items had been found concealed under a subfloor of the basement. The police returned to 20 Acorn Street and seized five additional cash register drawers, one of which had a McDonald's sticker on it, that had been concealed under the subfloor.

"Forensic evidence recovered included [fingerprints] and palm prints from the plastic bag that contained the masks and gloves, as well as DNA from two of the ski masks. Three of the fingerprints—the right index, the right thumb, and the left thumb—were identified as belonging to Anthony [Marcano]. A DNA sample obtained from the petitioner allowed a comparison to [be] made with DNA from two of the masks. One mask interior had DNA from at least three individuals; the petitioner was determined to be a contributor to that DNA profile. . . . A DNA sample from another mask's exterior had DNA from at least four individuals; the petitioner was determined to be a contributor to that DNA profile. . . .

"The state contended that the petitioner was guilty of the robbery and larceny in the first degree charges either as a principal offender or as an accessory to another participant in the crime. Additionally, the court instructed the jury on the robbery and larceny in the first degree charges as to the theory of vicarious liability. Thus, if the jury found beyond a reasonable doubt that the state had proven all elements of the conspiracy to commit robbery and larceny in the first degree charges, but that the state had not proven that the petitioner was a principal or accessory as [to] the robbery and larceny charges in counts one and three, then the jury could consider whether the petitioner was criminally liable for the criminal acts of the other [coconspirators] under vicarious liability. The jury was charged accordingly.

"The jury returned [a] guilty [verdict] on all counts. Specifically, the jury found the petitioner guilty of both

the robbery and larceny in the first degree charges as a [coconspirator] under the theory of vicarious liability." (Footnotes added; internal quotation marks omitted.) Id., 268–72. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of twenty-three years of incarceration, followed by five years of special parole. As a self-represented party, the petitioner appealed from the judgment of the trial court to the Appellate Court, but subsequently withdrew that appeal following the appointment and advice of appellate counsel.

Thereafter, the petitioner, as a self-represented party, filed a six count petition for a writ of habeas corpus. After being assigned counsel, the petitioner filed an amended seven count petition for a writ of habeas corpus claiming, inter alia, that his trial counsel had rendered ineffective assistance by failing to present the testimony of a second alibi witness, his aunt, Guillermina Meletrich.[3] Following a three day trial, the habeas court denied his petition for a writ of habeas corpus. Thereafter, the habeas court denied the petitioner's request for certification to appeal. The petitioner then appealed from the habeas court's judgment to the Appellate Court.

In that appeal, the petitioner claimed that the habeas court had abused its discretion in denying his petition and improperly had concluded that Chong did not render ineffective assistance by failing to call Guillermina Meletrich as a second alibi witness. Id., 268. The Appellate Court dismissed the petitioner's appeal, concluding that the petitioner had not established that Chong's decision not to call a second alibi witness amounted to deficient performance or that it prejudiced the petitioner. Id., 287. The petitioner appealed to this court, and we granted his petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that (a) trial counsel's failure to call the petitioner's aunt as an alibi witness was reasonable trial strategy and therefore not ineffective assistance of counsel, and (b) such failure did not prejudice the petitioner?" *Meletrich* v. *Commissioner of Correction*, 328 Conn. 908, 178 A.3d 1041 (2018).

On appeal, the petitioner claims that the Appellate Court incorrectly determined that the habeas court acted within its discretion in denying the petitioner certification to appeal because it is debatable among jurists of reason whether Chong rendered ineffective assistance by failing to present the testimony of Guillermina Meletrich. The respondent counters that the Appellate Court properly dismissed the petitioner's appeal because Chong's decision not to call a second alibi witness was reasonable trial strategy.[4]

The following additional facts and procedural history are relevant to our resolution of this claim. At the petitioner's criminal trial, Chong pursued an alibi defense.

In support of that defense, he presented the testimony of Christina Diaz, a woman with whom the petitioner had a romantic relationship and shared children.[5] Diaz testified as follows.

On the day of the robbery, Diaz travelled from New York, where she was living, in order to spend Thanksgiving with the petitioner. She arrived at the petitioner's residence, 20 Acorn Street, when "[i]t was still daylight outside" and proceeded to spend "the entire day and night at [his] house." She testified that neither she nor the petitioner left the house at any time that evening and that they spent the entire evening together. Her testimony was that they were together "100 percent of the time."

At the petitioner's habeas trial, several witnesses, including the petitioner, testified with regard to the petitioner's claim of ineffective assistance of counsel for failure to present a second alibi witness. First, the petitioner testified that he discussed his alibi with Chong. He stated that he told Chong that he had several alibi witnesses, including Guillermina Meletrich, Diaz, and "Tasha."

Additionally, Guillermina Meletrich testified at the habeas trial about the petitioner's whereabouts on the night of the robbery as follows. At the time of the robbery, she was living at the same house as the petitioner with her sister, nieces, and nephews. On the night of the robbery, she arrived home from work around 4:30 p.m. and stayed there the rest of the night. She testified that the petitioner and Diaz were also there and that the petitioner did not leave the house that day. She stated that she knew that he didn't leave "[b]ecause every time [she] came in he was there and [they] were kidding around." When asked if she would have been willing and available to testify at the petitioner's criminal trial, she responded that "[t]hey had asked [her] once to testify if he was at my house that day . . . and [she] said he was, but they never called [her]." She further testified that she would have provided the same testimony at the criminal trial that she provided at the habeas trial "because it's the truth."

Chong also testified at the habeas trial about his decision to present only Diaz as an alibi witness. He testified that the theory of defense was that the petitioner did not take part in the robbery. In particular, it was their position that the petitioner was at home at the time of the robbery. He testified that, in preparation of the alibi defense, he had spoken with "a number of relatives." Among those he spoke with was an aunt who lived at the residence, but he could not recall specific names of individuals or the substance of specific conversations. He did recall, however, "that a girlfriend claimed that she was in bed with [the petitioner] at the time of the . . . robbery" and that "it was [his] judgment at the time that she would provide the best testi-

mony with respect to his whereabouts at the time of the robbery." Chong acknowledged that Bethza Meletrich's testimony was a major piece of evidence for the state at the criminal trial and that impeaching her would have been helpful to the petitioner's defense.

With regard to Guillermina Meletrich, Chong testified at the habeas trial that he recalled speaking with an aunt who remembered being with the petitioner on the day of the robbery, but she couldn't "account for his whereabouts within the specific timeframe of the actual commission of the robbery."[6] He explained that an important consideration was the close proximity of the petitioner's residence to the robbery because the two locations were within a five minute drive from each other. Ultimately, he testified that, "after interviewing a number of family members and friends who were at the residence, people were coming and going and family . . . members could not account for his presence every hour, every minute of the day and night. The only person who could testify in [his] judgment and provide the strongest testimony was the girlfriend who said . . . that she was in bed with him at the . . . specific time that the robbery occurred . . . ." When asked if calling an additional alibi witness would have been helpful, Chong testified that "you're assuming that other alibi witnesses were available, credible alibi witnesses," but declined to speculate any further.

We begin with the applicable law and standard of review. "[W]e are mindful that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 666–67, 159 A.3d 1112 (2017).

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and the applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 592, 940 A.2d 789 (2008). "In determining whether the habeas court

abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Internal quotation marks omitted.) *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 658, 16 A.3d 676 (2011).

The following principles guide our review of the petitioner's claim of ineffective assistance of counsel. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 537–38, 198 A.3d 52 (2019).

We first address the performance prong of *Strickland*. In order for a petitioner to prevail on an claim of ineffective assistance on the basis of deficient attorney performance, "a defendant must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms." *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 31, 188 A.3d 1 (2018), cert. denied,      U.S.      , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019); see also *Strickland* v. *Washington*, supra, 466 U.S. 687–88.

"It is axiomatic that decisions of trial strategy and tactics rest with the attorney." *Crespo* v. *Commissioner of Correction*, 292 Conn. 804, 815 n.7, 975 A.2d 42 (2009). Furthermore, our review of counsel's performance is highly deferential. *Strickland* v. *Washington*, supra, 466 U.S. 689. Indeed, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks

omitted.) *Johnson* v. *Commissioner of Correction,* supra, 330 Conn. 538–39. Our cases instruct that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction,* 319 Conn. 623, 632–33, 126 A.3d 558 (2015).

"[T]he decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel . . . ." (Citation omitted.) *Bryant* v. *Commissioner of Correction,* 290 Conn. 502, 521, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant,* 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). "[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, [including] . . . when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction,* supra, 330 Conn. 548.

In the present case, Chong testified that the theory of the case pursued by the defense at the petitioner's criminal trial was that the petitioner did not participate in the robbery and, instead, that he was at home the entire evening. In light of this theory, Chong pursued an alibi defense by presenting the testimony of Diaz, a witness who could account for his whereabouts at every minute on the night of the robbery. Diaz testified that the petitioner never left the house on the evening of the robbery. She further testified that she knew this because she was with the petitioner "100 percent of the time." Thus, Diaz' testimony, if believed, offered an airtight alibi for the petitioner. Her testimony could establish that he neither was at McDonald's during the robbery nor confronted Bethza Meletrich on her way to work.

The petitioner asserts, however, that Chong's decision was not reasonable trial strategy because Guillermina Meletrich also could have provided a complete alibi for all of the offenses charged, and, thus, her testimony would have corroborated and bolstered that of Diaz. We disagree.

At the habeas trial, Guillermina Meletrich testified that she came home from work around 4:30 p.m. and remained at home the rest of the night. Regarding her specific knowledge of the petitioner's whereabouts, she testified that she knew the petitioner never left the house because "every time [she] came in he was there . . . ." As the Appellate Court aptly pointed out, Guillermina Meletrich's testimony implies that there were times when she was not with the petitioner. *Meletrich* v. *Commissioner of Correction,* supra, 178 Conn. App.

283. We agree with the Appellate Court that her testimony reveals that the petitioner was not always in her presence and that, therefore, she could not account for his whereabouts at every moment. This court has held that "[t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . . When the failure to call a witness implicates an alibi defense, an alibi witness' testimony has been found unhelpful and defense counsel's actions have been found reasonable when the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question . . . ." (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 548–49. In the present case, Guillermina Meletrich's testimony would not have been able to account sufficiently for the petitioner's whereabouts for the entire evening in question.

We find *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 697, 89 A.3d 426 (2014), appeal dismissed, 321 Conn. 765, 138 A.3d 278, cert. denied sub nom. *Jackson* v. *Semple*, U.S. , 137 S. Ct. 602, 196 L. Ed. 2d 482 (2016), instructive. In *Jackson*, the petitioner claimed that his trial counsel performed deficiently when he failed to call additional alibi witnesses at the petitioner's criminal trial. Id., 697. The petitioner in that case had been convicted on various charges related to the late night robbery of a deli. Id., 683–85 and n.2. At the petitioner's criminal trial, defense counsel presented the testimony of two alibi witnesses, one of whom testified that she was with the petitioner at her house at the time that the robbery occurred. Id., 698–99. The other testified that she saw the petitioner at least an hour prior to the robbery. Id., 699. The petitioner claimed, however, that his counsel performed deficiently by failing to call five additional alibi witnesses because the alibi witnesses that did testify were not credible and could not support a complete alibi defense, whereas the additional alibi witnesses could establish an uninterrupted timeline that accounted for his whereabouts during the time of the robbery. Id., 697.

At the petitioner's habeas trial in *Jackson*, each of the five alibi witnesses testified that they saw the petitioner at various times during the night of the robbery. Id., 699–701. None of them, however, could testify that they were with the petitioner during the exact time the crime occurred. Id., 701. Both the habeas court and the Appellate Court in *Jackson* concluded that defense counsel's decision not to call the additional alibi witnesses did not constitute deficient performance because none of the witnesses could account for the petitioner's whereabouts "immediately before, during, and after the robbery." Id.

Similarly, in the present case, Guillermina Meletrich could not account for the petitioner's whereabouts during the relevant time periods, namely, when the petitioner confronted Bethza Meletrich on her way to work and at the time of the actual robbery. Guillermina Meletrich would merely have provided general testimony that the petitioner was at her home at the times that she happened to look for him during the course of the evening.

Moreover, there was evidence in the record that the McDonald's restaurant was a close distance from the petitioner's house. Thus, we agree with the Appellate Court's reasoning that, even if the jury were to believe Guillermina Meletrich's testimony, it was possible for the petitioner to leave the house to confront Bethza Meletrich on her way to work and to participate in the robbery without Guillermina Meletrich noticing. See *Meletrich* v. *Commissioner of Correction*, supra, 178 Conn. App. 283. Therefore, under the circumstances, Guillermina Meletrich's testimony would not have been helpful because she could not sufficiently account for the petitioner specifically during the relevant time periods, which was critical considering the close proximity of the location of the robbery.

Conversely, Diaz, who testified that she was with the petitioner the entire night and that he never left the house, was able to account for the petitioner's whereabouts during both the robbery and the time that Bethza Meletrich claimed to have been confronted by the petitioner. On that basis, Chong made the strategic decision, to which we accord strong deference, to present the testimony of Diaz only.

Chong's decision finds support in our case law. Indeed, in *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 520, this court considered a similar set of facts. In that case, the petitioner claimed that his trial counsel performed deficiently by failing to present the testimony of two alibi witnesses at his criminal trial for murder. Id., 528. At the habeas trial, one of the witnesses testified that the petitioner was at home with her on the night of the murder but conceded that he was not always within her line of sight while she was watching television and tending to her child. Id., 530. Evidence presented at the petitioner's criminal trial showed that the home was in close proximity to the crime scene. Id., 552–53.

In explaining his decision not to call that witness, defense counsel testified that the witness' testimony would open for the jury the possibility that the petitioner could have left the house, committed the murder, and returned without the alibi witnesses noticing. Id., 551. Instead, counsel relied on the weakness of the state's case. Id. Indulging the strong presumption that counsel's strategic decisions were reasonable, this

court concluded that counsel's decision not to call the alibi witness was a reasonable strategic decision because that witness would have failed to account sufficiently for the petitioner's whereabouts at the time the crime occurred and would have placed the defendant in close proximity to the crime scene. Id., 554.

Similarly, in *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 537, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016), the petitioner claimed that his trial counsel performed deficiently when he failed to call several alibi witnesses, all family members of the petitioner, at the petitioner's criminal trial for arson. He contended that testimony from the alibi witnesses would have contradicted testimony from the state's two primary witnesses, who testified that they saw him near the location of the fire at the time it started. Id., 552–53. At the habeas trial, the alibi witnesses testified that they were at home with the petitioner, who lived across the street from the location of the fire, at the time the fire started. Id., 548–51. Each of the witnesses testified that the petitioner had been asleep in his room but that, upon awaking at the sound of the explosion, they saw the petitioner run outside to move his car. Id.

In *Spearman*, defense counsel testified that he chose not to call the alibi witnesses at trial because their testimony would place the petitioner in close proximity to the crime scene at the time of the fire, allowing for the possibility that the jury could determine that he left his house, started the fire, and returned before the alibi witnesses saw him. Id., 562. On that basis, counsel decided instead to rely on the weakness of the state's case. Id., 551. The Appellate Court concluded that counsel's decision not to call the witnesses did not amount to deficient performance given that none of the alibi witnesses was able to sufficiently establish the petitioner's whereabouts before the fire, the crime scene was in close proximity to the petitioner's house, and the alibi witnesses were all relatives of the petitioner. Id., 562–63.

Like the alibi witnesses in *Johnson* and *Spearman*, Guillermina Meletrich was not able to account for the petitioner's whereabouts at the relevant times. She was able to provide only general testimony that the petitioner was at home whenever she saw him. That house was in close proximity to both the crime scene and the location where Bethza Meletrich testified that she was approached by the petitioner. Indulging a strong presumption, as we are required to do, that Chong's strategic decision not to call Guillermina Meletrich to testify was sound trial strategy, and in light of the substance of her testimony and the close proximity of the relevant locations, we conclude that Chong's conduct did not constitute deficient performance. Rather, Chong made a reasonable strategic decision to call only the witness who could testify to the petitioner's whereabouts at all

of the relevant times.

The petitioner claims, however, that the testimony of Guillermina Meletrich was necessary to his defense against the conspiracy charges, and, thus, Chong's decision not to call Guillermina Meletrich was not reasonable trial strategy. In support of his claim, he asserts that the state's witness, Bethza Meletrich, provided the only evidence of conspiracy when she testified that the petitioner approached her on her way to work and coerced her into participating in the robbery. In light of this, he argues that Diaz' contrary testimony that the petitioner was at home during that time was critical to his defense. He claims that the jury would have been more likely to accept Diaz' testimony if Guillermina Meletrich's testimony that he was at home also had been presented.[7] For the same reasons discussed previously, we disagree that Guillermina Meletrich's testimony would have been helpful to the petitioner's defense against the conspiracy charges.

As stated previously, Guillermina Meletrich could testify only in general terms that the petitioner was home whenever she saw him. She could not, however, provide specific times during the afternoon and evening that could be used to support the assertion that he was home the entire time between 5 and 6 p.m. when Bethza Meletrich was approached on her way to work. Bethza Meletrich testified that the McDonald's restaurant was only a ten minute walk from the petitioner's home. Therefore, it would have been possible for the jury to conclude that the petitioner slipped out of his house, confronted Bethza Meletrich on her way to work, and returned home unnoticed by Guillermina Meletrich. Thus, contrary to the petitioner's claims, Guillermina Meletrich was not able to account for his whereabouts specifically during the time that Bethza Meletrich was approached on her way to work. We conclude that, with regard to being able to provide a complete alibi for all of the charges, the testimony of Guillermina Meletrich was not necessary or helpful to the petitioner's defense.

The petitioner asserts, however, that the present situation is similar to the one in *Skakel*, in which we concluded that defense counsel was ineffective for failing to call an additional alibi witness when all of the other alibi witnesses were potentially biased as a result of being related to the defendant. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 54. Specifically, the petitioner asserts that, because Diaz was the petitioner's girlfriend, she was biased, and Guillermina Meletrich's testimony regarding the petitioner's alibi was therefore necessary to bolster Diaz. We disagree and conclude that *Skakel* is distinguishable from the present case.

In *Skakel*, we determined that the alibi witness that was not called to testify was completely neutral and

disinterested by virtue of the fact that he was not related to the defendant and that he had not maintained contact with his only tie to the defendant's family in almost thirty years. Id., 51. On that basis, we concluded that the witness "would have been an independent and unbiased witness with no motive to lie" and whose testimony could have established "the credibility of the alibi generally" and "the credibility of the petitioner's witnesses more specifically." Id. Accordingly, this court concluded that the testimony of the alibi witness who was not called to testify at trial was not cumulative but would have been corroborative of the other alibi witnesses. See id. ("[alibi witnesses'] testimony, while corroborative, certainly was not cumulative, because the petitioner's other alibi witnesses were either siblings or cousins of the petitioner").

The present case is unlike *Skakel* because Guillermina Meletrich was not a neutral witness. In fact, she was related to almost everyone involved in the crime. Not only was she the aunt of the petitioner, but she also was the aunt of every one of the codefendants, including Bethza Meletrich.

We also will not assume, as the petitioner invites us to do, that her personal relationships with Bethza Meletrich and the petitioner cancel each other out and render her a neutral witness because it would require us to speculate as to the details of the nature of her relationship with each person. From the limited information before us, we cannot draw the same conclusion that we did in *Skakel* that Guillermina Meletrich had no biases or motives for testifying falsely. Therefore, we agree with the Appellate Court that "neither [Diaz nor Guillermina Meletrich] was entirely neutral and disinterested." *Meletrich* v. *Commissioner of Correction*, supra, 178 Conn. App. 286. Thus, unlike the alibi witness in *Skakel*, Guillermina Meletrich was not a neutral witness, and, thus, we cannot conclude that her testimony would have been corroborative and not cumulative. See *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 550–52 (considering in analysis fact that potential alibi witness was family and, therefore, that counsel made reasonable strategic decision not to call witness).

Finally, the petitioner contends that Chong's decision to call only Diaz as an alibi witness cannot be considered reasonable trial strategy because Chong could not articulate a reason for not presenting the testimony of Guillermina Meletrich. We disagree.

At the habeas trial, Chong testified that he didn't "recall every detail of the trial or the investigation, but what [he did] recall [was] that, after interviewing a number of family members and friends who were at the residence, people were coming and going and family . . . members could not account for his presence every hour, every minute of the day and night. The only person who could testify in [his] judgment and provide the

strongest testimony was the girlfriend who said . . . that she was in bed with him at the . . . specific time that the robbery occurred . . . ." He testified that "it was [his] judgment at the time that she would provide the best testimony with respect to his whereabouts at the time of the robbery." Thus, Chong did articulate a reason for presenting only Diaz' testimony. See, e.g., *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 303–304, 979 A.2d 507 (holding that defense counsel's decision not to call alibi witness was reasonable trial strategy despite counsel's inability to recall details of investigation of witness' testimony because witness was not strong and other alibi witnesses were available), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009); cf. *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 683, 51 A.3d 948 (2012) (considering in its analysis defense counsel's complete inability to explain reason for not investigating potential alibi witness).

After investigating multiple alibi witnesses, which included Guillermina Meletrich, Chong, in his professional judgment, determined that Diaz was the strongest alibi witness because she could account for the petitioner's whereabouts throughout the entire evening, including the relevant time periods, whereas Guillermina Meletrich could not. Indeed, we recognize that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 539.

On the basis of the foregoing, we conclude that the petitioner has not met his burden of overcoming the strong presumption that Chong's decision to present only the testimony of Diaz as an alibi witness was reasonable trial strategy. Thus, we further conclude that Chong's decision was not deficient performance. In light of our conclusion, we need not address the second prong of the *Strickland* test, namely, whether the petitioner was prejudiced by Chong's decision. See, e.g., *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 639 (declining to consider prejudice prong of *Strickland* test after concluding that defense counsel did not perform deficiently). Because the petitioner has not met his burden of showing that Chong performed deficiently, he cannot succeed on his claim of ineffective assistance of trial counsel. Therefore, we further conclude that it is not debatable among jurists of reason that Chong rendered ineffective assistance,[8] and that, thus, the Appellate Court correctly concluded that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] We note that Adam Marcano, Anthony Marcano, and Bethza Meletrich are the petitioner's cousins, and that each of them was named as a codefendant.

[2] At the petitioner's criminal trial, Bethza Meletrich testified that she left for work between 5 and 6 p.m. and that it took approximately ten minutes to walk to the McDonald's restaurant.

[3] This is the only claim of ineffective assistance advanced by the petitioner in the present appeal.

[4] We note that the parties agree that this is not a claim of ineffectiveness of counsel for failure to investigate an alibi witness. Rather, the petitioner claims that Chong was ineffective for failing to present the testimony of a known second alibi witness.

[5] At trial, Diaz stated that the petitioner was her "ex-husband." In his brief, the petitioner refers to Diaz as his "girlfriend."

[6] Although the record reveals that there were two aunts living at the petitioner's residence, the parties do not dispute, and there is support in the record, that Guillermina Meletrich is the aunt who spoke with Chong during his investigation of potential alibi witnesses and whose testimony is at issue in this appeal.

[7] The petitioner does not claim on appeal that the evidence was insufficient to support his conviction on the conspiracy charges.

[8] The petitioner cites *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664, and *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 502, as support for the contention that it is debatable among jurists of reason as to whether trial counsel's failure to investigate and present the testimony of an alibi witness is deficient performance. Those cases, however, are factually distinguishable from the present case. In *Gaines*, the petitioner's trial counsel failed to investigate potential alibi witnesses entirely and failed to present any alibi defense despite there having been witnesses who could testify to being with the defendant on the night of the murders. *Gaines* v. *Commissioner of Correction*, supra, 683–84. This court concluded that, because counsel failed to contact the potential alibi witnesses, he could not know the substance of their testimony, and, thus, his failure to investigate was not based on reasonable professional judgment. Id. In the present case, Chong investigated an alibi defense by speaking with several alibi witnesses, and, on the basis of information gained during his investigation, he determined that Diaz would provide the strongest testimony at trial.

In *Bryant*, the petitioner's trial counsel failed to present four witnesses whose testimony would have supported a third-party culpability defense despite being aware of the witnesses and knowing of their potential testimony. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 519–20 and n.12. This court concluded that counsel's decision amounted to deficient performance that was prejudicial to the petitioner because the four witnesses were independent and credible, and their statements were made contemporaneously to the events in question. Id., 521. As such, a reasonable doubt could have been raised in the minds of the jurors as to the petitioner's guilt. Id., 520. In the present case, Chong presented an alibi defense with the witness that he believed to be the strongest. Moreover, as previously discussed, Guillermina Meletrich was not a neutral witness.