******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DARRYL CRENSHAW *v.* COMMISSIONER
OF CORRECTION
(AC 44915)

Prescott, Elgo and Seeley, Js.

*Syllabus*

The petitioner, who had been convicted of the murder, assault and kidnap-
ping of the victim, sought a writ of habeas corpus. He claimed that his
trial counsel, M, rendered deficient performance by failing to present
a specific theory of defense to establish that the petitioner lacked the
intent to cause the victim's death. The petitioner had driven to a nail
salon parking lot where he met the victim, whom he had recently begun
dating. The petitioner punched the victim in the face as she entered his
car and punched her in the face a second time as they drove away. F,
who was in his car in the parking lot at the time, witnessed both punches.
The petitioner later gave the police a statement in which he admitted
that he would choke the victim when he became angry. A state medical
examiner, C, concluded that the victim had been strangled and had
suffered blunt force trauma to her head and neck but was unable to
say whether the head injury or strangulation caused her death. C stated
that a person with the victim's strangulation injury could have survived
and that it was possible that the victim did not lose consciousness
immediately after the infliction of the head injury but could have survived
for up to ten hours. At the habeas trial, the state's chief medical examiner,
G, agreed with C as to the cause and manner of the victim's death but
could not rule out the possibility that her head injuries were caused by
later trauma to the same area of the head. Although M testified that his
strategy was to present a cohesive defense that accounted for all of
the evidence and showed that the petitioner lacked the intent to kill
regardless of which injury caused the victim's death, the petitioner
claimed that M rendered deficient representation because the only rea-
sonable strategy was to advocate that the two punches were the cause
of death insofar as they created a temporal distance between the fatal
act and the victim's death that he could have relied on to demonstrate
lack of intent. The petitioner further claimed that M never recognized
or focused on the punches as being the cause of the victim's death and
that he did not understand the relevant medical and forensic science.
*Held*:

1. The habeas court did not abuse its discretion in denying the petitioner
   certification to appeal from the judgment denying his petition for a writ
   of habeas corpus; the petitioner failed to demonstrate that his claims
   involved issues that were debatable among jurists of reason, that a court
   could resolve them in a different manner or that the questions were
   adequate to deserve encouragement to proceed further.

2. The habeas court properly determined that the petitioner failed to establish
   that M rendered constitutionally deficient performance regarding the
   two punch defense theory or that he failed to prepare sufficiently for
   trial, learn the relevant forensic science and adequately cross-examine
   witnesses:

   a. M presented a comprehensive, objectively reasonable theory of defense
   that addressed all the evidence at trial and focused on the petitioner's
   lack of intent to cause the victim's death: instead of relying exclusively
   on the punches in the parking lot as being the cause of death, M accounted
   for evidence that the two punch theory did not address, the most
   important of which was that strangulation, as C testified, was just as
   plausible as the cause of death as a head injury; moreover, M's decision
   not to link the victim's head injury to the punches in the parking lot was
   supported by the testimony of C and G, who stated that the victim may
   have experienced a lucid period before dying as a result of the head
   injury and, thus, that the fatal injury could have been inflicted later, after
   the parking lot incident; furthermore, M's defense strategy encompassed
   the general principle of lack of intent behind the two punch theory, as
   M testified that punching someone does not equate with an intent to kill
   and asserted during cross-examination of C and in closing argument to

the jury that the possibility that the victim experienced a lucid period before dying as a result of the head injury demonstrated that the petitioner lacked the specific intent to cause her death.

b. The record supported the habeas court's finding that M sufficiently understood the medical science at issue, adequately prepared for trial and presented a well thought out theory of defense: contrary to the petitioner's contention that M had "no idea" about certain medical principles and was unfamiliar with much of the forensic science underlying his defense, M's testimony, which the court credited, demonstrated that he familiarized himself with the relevant medical science by meeting with C twice and taking notes and focusing on understanding what was being discussed before brainstorming with legal colleagues and deciding how to utilize C's testimony; moreover, although M did not ask C at trial whether an individual could experience a lucid interval following strangulation and then die, that did not compel an inference that M did not understand the medical science, and it was reasonable to present a theory of defense that relied not on the punches in the parking lot but, rather, accounted for strangulation and head trauma, both of which C and G agreed could have caused the victim's death; furthermore, M's decision to impeach F's testimony was not unreasonable, as the petitioner claimed, as M's inquiry about F's statement to the police that he saw one punch before changing his story to say that he saw two punches was an attempt by M to lower the number of punches that occurred so as to bolster the defense of lack of intent.

Argued May 23—officially released September 13, 2022

*Procedural History*

Petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Chaplin, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*David R. Kritzman*, for the appellant (petitioner).

*Alessandra M. Santacroce*, certified legal intern, with whom were *Michele C. Lukban*, senior assistant state's attorney, and, on the brief, *Sharmese L. Walcott*, state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SEELEY, J. The petitioner, Darryl Crenshaw, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal, and (2) improperly concluded that he failed to establish that his trial counsel's performance was constitutionally deficient. We disagree and, accordingly, dismiss the appeal.

The following facts and procedural history, as set forth by our Supreme Court in the petitioner's direct appeal from his conviction or found by the habeas court, are relevant to our resolution of this appeal. "In June or July, 2008, the victim began dating the [petitioner]. . . . On August 7, 2008, at approximately 5:15 p.m., the victim arrived at the house of Shavonne Coachman, a friend . . . [and] . . . they drove together to Supreme Clientele, a beauty salon (salon) . . . . Shortly thereafter, the [petitioner] arrived at the salon, and the victim went outside. A patron of the salon, Timothy Freeman, who was sitting in his car in the parking lot, saw the [petitioner] and the victim flail their arms as they argued. . . . After the victim entered the [petitioner's] vehicle, the [petitioner] punched her in the face and proceeded to drive away. Freeman described the incident as a sucker [punch] . . . . As the [petitioner] drove away, he punched the victim in the face a second time. By the time Coachman ran to the front door of the salon, the [petitioner] and victim were gone. . . . The victim never came back [to the salon].

"At around 6 or 7 p.m. that evening, the [petitioner and the victim] went to the apartment of Eruverto Flores, [the boyfriend of Elisa Astacio, the victim's friend and coworker] . . . . The victim had a blood clot in her eye, the inside of her left eye was red and bloodshot, and the area under her eye was swollen. Flores testified that it was obvious that the [petitioner] had hit the victim. . . . Flores testified that the victim was pretty much sitting [in the apartment] with her head down . . . not really interacting with anybody, just sitting there. She did not participate in the conversation. About fifteen or twenty minutes later, the [petitioner] and the victim left together. . . .

"Between 2 and 3 a.m. on August 8, 2008, the [petitioner's] next door neighbor, Guy Maynard, saw the [petitioner] pull up in his vehicle to the front of the [petitioner's] residence . . . . Maynard testified that, after the car stopped and the lights went off, the [petitioner] got out and . . . walked around the front of the car to the [passenger] side, where he opened the door and picked up somebody out of the front seat of the car. The [petitioner] cradled the individual like you would hold a

child, with both arms underneath, and [c]arried [her toward] the front of the house. Maynard could tell that the person being carried was slight and African-American, and he believed the person was probably a female. . . . The [petitioner] carried the person into his apartment. After some time had passed, Maynard saw the flickering of lights from a television in the [petitioner's] apartment. Maynard did not hear any screaming or arguing. . . .

"Later, during the early morning hours of August 8, Astacio received a call from the [petitioner] after she arrived at work. The [petitioner] informed Astacio that he had fucked up and that he and the victim had gotten into an argument during which he slapped her . . . . [T]he [petitioner] said that the victim could not come to work that day and asked her to make up an excuse for the victim. . . . After this conversation . . . Coachman told Astacio what had occurred at the salon. Coachman then called the victim's parents, who reported to the police that the victim had been kidnapped.

"At approximately 9 or 10 a.m. that same day, the [petitioner] met [Teosha Sease, a woman he had planned a date with for that day] and brought her to Six Flags [New England amusement park in Agawam, Massachusetts]. At one point while they were at Six Flags, the [petitioner] became upset and exclaimed that he saw [the victim's] face and she wasn't breathing. When Sease asked the [petitioner] what he was talking about, he stated that he's not a murder[er]; he's a good person . . . . The [petitioner] and Sease remained at [Six Flags] until 10 or 10:30 p.m., when Torchy Colvin, an acquaintance of the [petitioner], came to pick them up. . . . The [petitioner] told Colvin and Sease that they could take any of his possessions from his house because he was going south to live with family members. . . .

"On August 10, 2008, the police executed a search warrant for the [petitioner's] residence. They discovered the victim's body in one of the bedrooms. Blood-like stains were found on a laundry basket in the bedroom, a bath towel and several articles of clothing, including on a pair of denim shorts. One of the victim's fake nail[s] was missing, and a fingernail was broken. Subsequent forensic analysis revealed that the [petitioner's] blood was found under the victim's fingernails . . . . In addition, the victim's blood was found in the front passenger side of the [petitioner's] vehicle.

"An autopsy revealed that the victim had suffered a variety of injuries, including trauma to the head, scalp, arms, left eye and abdomen, indicative of direct injuries to those areas. The victim also had abrasions on her neck, consistent with fingernail marks, and evidence of petechial hemorrhaging in the membranes of her eyes and gums. [Harold Wayne Carver II, the] chief

medical examiner concluded that the victim had been strangled and also had suffered blunt force trauma to her head and neck. He also concluded that the victim was alive when these injuries were inflicted. . . .

"The police ultimately found the [petitioner] living under an alias in Mexico. After the [petitioner] was extradited to the United States from Mexico, he provided a sworn statement in which he described the circumstances leading up to the victim's death. He stated that the victim had made him jealous and that he pushed her during an argument. He stated that he slapped the victim while they were lying on his bed. When the victim said please, [n]o, he said: [Y]ou got a man at home to take care of you, why are you runnin[g] around. He stated that he grabbed her by the neck and choked her. [The petitioner stated that he] choked and slapped her every time [he] got mad. [He] would choke her hard [and] then stop. [He] would get angry again and continue to choke her. He then said that the victim got tired and went to bed, and that he slept on the couch. The next morning, the victim would not wake up, but the [petitioner] felt her pulse and thought she was alive. The [petitioner] explained that he then went to Six Flags, and, when he returned, the victim was barely breathing. The [petitioner] said that he propped her head up and laid her down in the bed, [but that] she wasn't breathing. He then took off her clothes and tucked her into bed, just hoping she would wake up. He believed that the victim had died from suffocation. Although it is uncontested that the [petitioner caused] the victim's death, the [petitioner] claimed that the victim's death was accidental." (Footnotes omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, 313 Conn. 69, 72–79, 95 A.3d 1113 (2014).

The habeas court in its memorandum of decision denying the petition noted: "The record reveals that . . . Carver testified at the petitioner's criminal trial . . . that he could not say which injury [the strangulation or a head injury] caused [the victim's] death, and that either of the two injuries individually could have been the cause. He also testified that a person with the [victim's] head injury may or may not immediately lose consciousness and could survive two to ten hours between the infliction of lethal head trauma and death. . . . Carver set forth three possible scenarios following the infliction of the [victim's] head trauma, if it was the head trauma that caused her death: (1) the [victim] did not immediately lose consciousness but lost consciousness later; (2) the [victim] lost consciousness, regained consciousness and lapsed back into unconsciousness as the swelling and blood accumulation accrued; or (3) the [victim] became unconscious immediately and did not wake up. . . . Carver could not testify as to which of the scenarios occurred in this case. Carver also testified that a person with the [victim's] strangulation injury could survive." At no point was Carver asked whether

he believed the two punches inflicted by the petitioner at the salon parking lot were the definitive cause of the head injuries.

The petitioner was charged with murder in violation of General Statutes § 53a-54a (a), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and two counts of kidnapping in the second degree in violation of General Statutes § 53a-94 (a). On October 6, 2010, following a jury trial, the petitioner was convicted on all counts. On direct appeal, our Supreme Court reversed the trial court's judgment as to one of the two kidnapping convictions and remanded the case for resentencing. See *State* v. *Crenshaw*, supra, 313 Conn. 72, 98–99. On remand, the trial court vacated the sentence on one of the two kidnapping counts, rendered judgment of acquittal on that count and imposed a total effective sentence of seventy-eight years of incarceration. *State* v. *Crenshaw*, 172 Conn. App. 526, 528–29, 161 A.3d 638, cert. denied, 326 Conn. 911, 165 A.3d 1252 (2017).

The petitioner commenced this habeas action in 2016, alleging, among other claims, ineffective assistance of his criminal trial counsel, Robert Meredith.[1] The habeas court conducted a trial on January 14 and 15, 2020, during which the petitioner presented the testimony of Meredith, James R. Gill, Carver's successor as the state's chief medical examiner, and Brian Carlow, an attorney whom the petitioner presented as a legal expert. On June 28, 2021, the habeas court, *Chaplin, J.*, issued a memorandum of decision in which it denied the petitioner's habeas petition. The petitioner subsequently filed a petition for certification to appeal, which the court also denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the habeas court abused its discretion in denying his petition for certification to appeal from the denial of his petition. We disagree.

We begin by reciting the governing legal principles. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the [disposition] of his [or her] petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he [or she] must demonstrate that the denial of his [or her] petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he [or she] must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must

demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Whistnant* v. *Commissioner of Correction*, 199 Conn. App. 406, 414–15, 236 A.3d 276, cert. denied, 335 Conn. 969, 240 A.3d 286 (2020).

For the reasons set forth in part II of this opinion, we conclude that the petitioner has failed to demonstrate that his claims involve issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions he raised are adequate to deserve encouragement to proceed further. Thus, we further conclude that the habeas court did not abuse its discretion in denying the petition for certification of appeal.

II

We now turn to the petitioner's substantive claim on appeal. The petitioner asserts that the habeas court improperly concluded that he failed to establish that his trial counsel's performance was constitutionally deficient. Specifically, the petitioner alleges that Meredith was ineffective because he failed (1) to recognize and present a specific theory of defense, and (2) to prepare adequately for trial, learn the relevant forensic science, and adequately examine the expert and fact witnesses. We conclude that the court properly determined that the petitioner failed to establish that Meredith's performance was constitutionally deficient.

We first set forth our standard of review and the relevant legal principles. "Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Humble* v. *Commissioner of Correction*, 180 Conn. App. 697, 703–704, 184 A.3d 804, cert. denied, 330 Conn. 939, 195 A.3d 692 (2018).

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677–78, 51 A.3d 948 (2012).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Citation omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 830, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).[2]

In order for a petitioner to prevail on a claim of ineffective assistance on the basis of deficient performance, he must show that, "considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 627, 212 A.3d 678 (2019). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . . *Strickland* v. *Washington*, supra, 466 U.S. 688–89." (Internal quotation marks

omitted.) *State* v. *Santiago*, 213 Conn. App. 358, 367–68, 277 A.3d 924 (2022), petition for cert. filed (Conn. July 5, 2022) (No. 220104).

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the* [*petitioner*] *must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.*" (Emphasis added; internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, 178 Conn. App. 266, 278, 174 A.3d 824 (2017), aff'd, 332 Conn. 615, 212 A.3d 678 (2019); see also *Santiago* v. *Commissioner of Correction*, supra, 213 Conn. App. 367–68. Indeed, our Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 637.

At the habeas trial, the petitioner argued that Meredith's performance was deficient because he had a duty to raise a defense focused on the lack of specific intent to cause the death of the victim[3] based on what he labels as the "two punch theory." This theory is, in essence, a factual assertion that it was the two punches at the salon parking lot that caused the victim's death, and that, when the victim was at Flores' apartment, she experienced a lucid interval and subsequently died from the consequences of the punches without any further inflicted injuries. The petitioner argued that advocating this theory of the cause of death, as opposed to death by strangulation, was the only objectively reasonable strategy because it created a temporal distance between the fatal act and the victim's death.[4] The petitioner further contended that this theory permitted the argument that the punches were the cause of death without any further infliction of trauma to the victim's head and that it "dovetailed perfectly with the state's evidence . . . ."

According to the petitioner, all of these reasons supported the argument that he did not intend to cause the victim's death, for no reasonable person would expect two isolated punches to cause a person to die hours later. The petitioner consequently argued that Meredith's failure to present and argue this "two punch theory" was objectively unreasonable. The petitioner additionally argued that Meredith's performance was deficient because he failed to prepare sufficiently for trial, learn the relevant forensic science, and adequately cross-examine the expert and fact witnesses. The petitioner challenges the habeas court's rejection of these arguments, which we address in turn.

A

The petitioner first argues that the habeas court improperly determined that Meredith did not render deficient performance when he failed to present the "two punch theory" of defense. Specifically, he contends that the "two punch theory" was the only reasonable strategy for Meredith to have used to demonstrate that the petitioner did not intend to cause the death of the victim. We agree with the habeas court's conclusion that the petitioner did not meet his burden of demonstrating that Meredith's trial strategy was objectively unreasonable. We conclude that the trial strategy employed by Meredith, which included establishing the petitioner's lack of intent to kill the victim, was supported by ample tactical justifications and "falls into the category of trial strategy or judgment calls that we consistently have declined to second guess." (Internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 126 Conn. App. 110, 132, 10 A.3d 1079, cert. denied, 300 Conn. 919, 14 A.3d 333 (2011). Accordingly, we conclude that the petitioner's argument must fail.

The following additional facts are relevant to our discussion of this argument. At the habeas trial, "Meredith testified that his theory of defense was that the petitioner never intended to kill the victim and that he developed his theory at trial through [Carver's] testimony and the petitioner's statement to the police. He testified that [Carver's] testimony helped establish the petitioner's lack of intent to kill by corroborating the petitioner's statement wherein he indicated that he would choke the victim before whenever he was angry and did not have reason to believe that if he choked her again on a subsequent occasion that she would die as a result. . . . Meredith [additionally] indicated that, if the petitioner punched the victim and inflicted the head injuries without a weapon, it further supported the [defense] theory that the petitioner did not intend to kill her. [Meredith] also noted that there was no evidence of the [victim's] time of death, the time frame of the events involving her death was very broad and a lot of the evidence in the petitioner's case 'cut both ways.'

"[Meredith additionally] indicated that his plan was to put together a cohesive defense to address all of the variables and use the petitioner's statement and physical evidence to demonstrate to the jury that the petitioner lacked the requisite intent for a murder conviction." In other words, Meredith's overarching strategy was that the petitioner had not intended to kill the victim, regardless of whether she died from the two punches in the salon parking lot, strangulation, or any injury or injuries that had occurred during the relevant time period. The habeas court found Meredith's testimony to be credible.

At the habeas trial, "[Gill] testified that he agreed with Carver's determinations regarding [the] manner and cause of death. Specifically, he agreed that there were two distinct injuries, neck compression and head trauma, and either could have resulted in the victim's death. He testified that the three scenarios discussed at the underlying trial by [Carver] are three equally plausible explanations for the victim's death. . . .[5] Additionally, he testified that lethal neck compression would not be followed by a lucid interval." (Footnote added.) Unlike Carver, Gill testified that the victim's head injuries were consistent with the two punches inflicted at the salon parking lot, but he also could not rule out the possibility that the injuries were caused by later trauma to the same area of the head. The court credited Gill's testimony.

The court concluded that the petitioner had failed to establish that Meredith's performance was constitutionally deficient. Specifically, it determined that it was clear from Meredith's "credible testimony that there was ample tactical justification for the course he took in defending the petitioner, and, thus, the petitioner [had] failed to demonstrate that counsel's actions were unreasonable under the facts of this case." We agree.

At the outset, we note that, on appeal, the petitioner contends that Meredith's representation was deficient because, "[a]lthough Meredith's defense was generically based upon the theory that [the victim] died from head trauma, [Meredith] never recognized, much less 'focused' on, the two punches in the salon parking lot as the cause of death." The petitioner repeatedly has argued that the "two punch theory" was "the best" theory of defense.[6] We disagree for two principal reasons. First, it reflects a misunderstanding of the appropriate standard for determining whether the petitioner was deprived of his constitutional right to effective counsel. The test for deficient performance is whether trial counsel's strategy was objectively reasonable considering all of the circumstances; see, e.g., *Meletrich* v. *Commissioner of Correction*, supra, 178 Conn. App. 277–78; and, for the reasons we will set forth, we conclude that Meredith's strategy met this standard. Second, the petitioner's argument rests on a false factual

premise because the record reveals that Meredith in fact asserted the essence of the "two punch theory" to the jury while still accounting for other evidence in the case that the jury reasonably may have credited.

Meredith's strategy was objectively reasonable because it was, as he explained in his testimony, a cohesive defense that addressed all of the evidence in the criminal trial. Notably, there was additional evidence presented that the "two punch theory" failed to address, the most important being that strangulation was just as plausible as the cause of death as a head injury.[7] Instead of relying exclusively on the two punches in the parking lot as the cause of death, Meredith's approach accounted for the possibility that the jury might determine that strangulation was the cause of death. In his testimony, Meredith reasoned: "Carver said that . . . [the victim] could [have] died from strangulation alone or she could [have] survived that strangulation. And [the petitioner's] statement said . . . I would choke her before whenever I was mad and she would never die and this time she did . . . so it shows a lack of intent because he's choked her before, and if he choked her again at a subsequent occasion, he wouldn't think or have reason to believe that she would die because of that."[8] Accordingly, we conclude that it was sound trial strategy for Meredith to address Carver's testimony that strangulation could have been the cause of death, rather than to focus exclusively on the "two punch theory."

We further conclude that it was reasonable for Meredith to refrain from focusing solely on the punches in the parking lot as the cause of death because the "blows" to the victim's head that caused the fatal injury could have taken place at some other point, and, thus, he developed a tactical strategy that "cover[ed] any hit." Meredith's belief that there may have been additional "blows" or violence following the parking lot incident was well founded. Carver and Gill testified that it was *possible* that the victim experienced a lucid state following the head trauma. Additionally, they both testified that it was equally possible that the victim slipped into immediate unconsciousness following a fatal blow, whether that event was or was not the punches in the salon parking lot. This testimony supports the theory that the fatal injury could have been inflicted later, after the incident in the parking lot and, therefore, that the victim's death was not caused definitively by the two punches in the salon parking lot. Thus, Meredith's strategy was reasonable, regardless of the fact that he expressly did not link the two punches in the salon parking lot to the head injury.

Furthermore, as the respondent, the Commissioner of Correction, has pointed out in his brief, the strategy that Meredith set forth at the criminal trial encompassed the general principle behind the "two punch theory,"

that is, the petitioner lacked the intent to cause the death of the victim. In Meredith's testimony, which the habeas court found to be credible, he stated that his "theory of defense was that, in a broad sense, that [the petitioner] never intended to kill [the victim]. Period." Meredith recognized the factual significance of the punches that had occurred in the salon parking lot and accounted for them in his defense strategy. He explained at the habeas trial, "if [the petitioner] punched her and inflicted those wounds, then just [because] you punch someone doesn't mean you are gonna kill them." In fact, in his cross-examination of Carver and in his closing statement to the jury, Meredith asserted the essence of the "two punch theory," that is, the possibility that the victim, after having been punched in the head, experienced some sort of lucid period before dying as a result of the head injury, in an effort to demonstrate the absence of the specific intent to cause the victim's death.

The most instructive example of Meredith's referring to the underpinnings of the "two punch theory" was a hypothetical question he posed to Carver during his cross-examination: "Now, let me ask you this. Was your autopsy consistent with the following scenario, someone complaining of a headache, closing their eyes, rocking back and forth on the Thursday evening . . . having incurred a head injury, as you found, and then being subsequently found [deceased] on Sunday and then brought to your facility sometime Sunday . . . incurring the head injury on Thursday, complaining about a headache and dizziness on the Thursday evening—is your autopsy consistent with that scenario?" Carver responded, "[t]here's nothing inconsistent about it."

Although Meredith did not reference any punches in the hypothetical, he did so in his closing argument to the jury with the following statements: "[The petitioner] didn't know what type of injury had happened when he had punched [the victim] in the head [at the salon parking lot]; he didn't know . . . . He doesn't know what caused her to fall into this death. He's not like . . . Carver; he doesn't know when a head injury happens. In his mind, he probably punched her, that's not going to kill someone . . . . He can't process what he did to [the victim]. He can't understand what happened to [the victim] because he doesn't know how him hitting her like he did ended up in her dying." In his closing remarks, Meredith also reminded the jury of the hypothetical question he had asked Carver: "Now, pay attention to the hypothetical question I asked of [Carver] on cross-examination; please pay attention to that because that will help you determine whether or not [the petitioner's] story was credible or not."

In summary, we agree with the habeas court's conclusion that the petitioner failed to demonstrate that Meredith's performance was constitutionally deficient. The

petitioner is tasked with overcoming the presumption that Meredith's decisions were objectively reasonable, and he can successfully do so only by demonstrating that there was no "tactical justification for the course taken." (Internal quotation marks omitted.) *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 256, 257 A.3d 423, cert. denied, 338 Conn. 909, 258 A.3d 1279 (2021). Meredith developed and presented a theory of defense, which focused on the petitioner's lack of intent to cause the victim's death, that was comprehensive and objectively reasonable, despite Meredith's decision not to exclusively argue that the punches in the parking lot were the cause of death. The fact that Meredith did not present the lack of specific intent defense in the precise manner that the petitioner now prefers[9] does not dictate a conclusion that Meredith's performance was deficient. See, e.g., *Ricardo R.* v. *Commissioner of Correction*, 185 Conn. App. 787, 803–804, 198 A.3d 630 (2018), cert. denied, 330 Conn. 959, 199 A.3d 560 (2019).[10] We conclude that the habeas court properly determined that the petitioner failed to establish deficient performance regarding the "two punch theory."

B

The petitioner next argues that Meredith rendered deficient performance because he failed to prepare sufficiently for trial, learn the relevant forensic science, and adequately cross-examine the expert and fact witnesses. Specifically, the petitioner argues that Meredith (1) failed to understand the medical science relevant to the case and, consequently, failed to cross-examine Carver on pertinent issues, and (2) improperly impeached Freeman, who witnessed the two punches at the salon parking lot, instead of using him to bolster the petitioner's defense. The habeas court found that Meredith had sufficient understanding of the medical science and adequately did prepare for, and present, a "well thought out theory of defense . . . ." We conclude that these facts are supported by the record, and, thus, the petitioner's claim must fail.

It is well established that "[i]t is not enough for the petitioner to simply prove the underlying facts that his attorney failed to take a certain action. Rather, the petitioner must prove, by a preponderance of the evidence, that his counsel's acts or omissions were so serious that counsel was not functioning as the counsel guaranteed by the sixth amendment, and as a result, he was deprived of a fair trial." (Internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 181 Conn. App. 778, 801, 189 A.3d 135, cert. denied, 329 Conn. 911, 186 A.3d 707 (2018). Furthermore, "[a]n attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy. . . . The fact that counsel arguably could have inquired more deeply into certain areas, or failed to

inquire at all into areas of claimed importance, falls short of establishing deficient performance." (Internal quotation marks omitted.) *Chase* v. *Commissioner of Correction*, 210 Conn. App. 492, 501, 270 A.3d 199, cert. denied, 343 Conn. 903, 272 A.3d 199 (2022).

First, we address the petitioner's argument that Meredith failed to learn the relevant forensic science in preparation for trial and, as a result, did not cross-examine Carver properly. The petitioner argues that Meredith "was unfamiliar with much of the relevant forensic science underlying his defense." After our thorough review of the record, we agree with the habeas court's conclusion that Meredith "had sufficient knowledge and understanding of the pertinent forensic and medical science evidence . . . ."

Despite the petitioner's statements throughout his brief that Meredith had "no idea" as to certain medical principles, the record shows that Meredith simply could not recall whether he had such knowledge at the time of the criminal trial.[11] Roughly ten years had passed since Meredith's representation of the petitioner, and, "[a]s this court previously has explained, [t]ime inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude . . . *Strickland*'s strong presumption must stand." (Internal quotation marks omitted.) *Coltherst* v. *Commissioner of Correction*, 208 Conn. App. 470, 483, 264 A.3d 1080 (2021), cert. denied, 340 Conn. 920, 267 A.3d 857 (2022).

Meredith's testimony, which the habeas court credited, demonstrated that he took adequate steps to familiarize and educate himself regarding the relevant medical science. Meredith, along with his cocounsel and a legal intern, met with Carver twice in preparation for the trial. Meredith took some notes, but he acknowledged that, during important meetings, he tended to take fewer notes and instead focused on understanding what was being discussed. Meredith then "brainstorm[ed]" with his colleagues and, ultimately, decided that using Carver's testimony that the victim may have died of strangulation was important because it "matched up" with the petitioner's statement that he had choked the victim in the past but she always survived, thus demonstrating a lack of intent to kill.

Additionally, the petitioner argues that, had Meredith understood the relevant medical science properly, he would have focused solely on the two punches at the salon parking lot to establish the lack of intent defense. Carver and Gill testified that a person who is choked to death will not regain consciousness. According to Carlow, it was more difficult for Meredith to persuade the jury that the petitioner had not intended to kill the victim by strangulation. Thus, as Carlow explained at

the habeas trial, "it was imperative for trial counsel to know whether or not a lucid interval could occur following a lethal neck compression [because] it was easier to argue lack of intent to kill based on two punches to the [victim's] head followed by a lucid interval with no further head trauma than choking the [victim] to death without an intervening lucid interval because a lucid interval separates the time of death from the cause of death."

The petitioner is correct that Meredith did not ask Carver whether an individual could experience a lucid interval following a strangulation and then die, but we do not agree that the failure to ask this question compels an inference that Meredith did not understand the medical science. We conclude that it was reasonable for Meredith to present a theory of defense that did not exclusively rely on the two punches at the salon parking lot, as we thoroughly discussed in part II A of this opinion. Furthermore, Meredith's failure to pursue a line of inquiry into whether an individual could experience a lucid interval following a strangulation and then die does not establish that he did not understand the medical science. This argument by the petitioner is one of strategy masquerading as an inadequate preparation argument, and it therefore must fail.[12]

Both medical examiners, Carver at the criminal trial and Gill at the habeas trial, testified that the cause of death was either head trauma or strangulation. It was objectively reasonable, if not crucial, for Meredith to present a theory of defense that accounted for the victim's death under either scenario. Meredith needed to be prepared to argue to the jury that the petitioner did not intend to cause the death of the victim, whether she died by strangulation or from head trauma. Meredith's strategic decision to address both possible causes of death was made after he reviewed the evidence in the case, including the petitioner's statement, after he met with Carver on two occasions, and after he discussed the case with his colleagues. On the basis of Meredith's objectively reasonable defense strategy, we conclude that the habeas court properly determined that "Meredith sufficiently understood and investigated the relevant issues and presented a well thought out theory of defense given the set of factual circumstances in the petitioner's underlying criminal trial."

We next address the petitioner's argument that Meredith's performance was deficient because he impeached Freeman, who witnessed the punches in the parking lot, instead of bolstering his credibility to support the defense. At the criminal trial, Freeman testified and "indicated that he was sitting in his car outside of the salon on August 7, 2008, when he observed a man 'sucker punch' a woman twice in the face." At the habeas trial, Meredith testified that, during his cross-examination of Freeman, he inquired about Freeman's

account having changed after Freeman realized that he knew the victim's family. Meredith "indicated [that] he wanted to draw attention to the fact that Freeman originally stated that he witnessed the petitioner punch the [victim] once, and then changed his statement to indicate that he witnessed the petitioner punch the [victim] twice and that he 'sucker punched' her. [Meredith explained] that his rationale behind impeaching Freeman on cross-examination was to attempt to lower the number of punches that occurred because that would serve to bolster the defense of lack of intent."

Also at the habeas trial, "Carlow . . . testified that, rather than impeaching Freeman's testimony, [Meredith] should have utilized it to bolster the defense by setting forth a timeline wherein the [victim] was punched twice by the petitioner, as Freeman testified, experienced a lucid interval at Flores' apartment and subsequently died as a result of the blunt force trauma." The petitioner argues that Meredith's "ill-advised strategy to impeach Freeman's credibility and ability to observe was the product of inadequate preparation." We disagree.

First, the only reason the petitioner has put forth as to why challenging Freeman's credibility was "ill-advised" is that Freeman's testimony supported the "two punch theory." This appears to be nothing other than an argument that the "two punch theory" was the only reasonable defense strategy, and, once again, we disagree with that contention.

Second, we note that, when a petitioner is unable to meet his burden of showing that trial counsel's strategy was unreasonable, he is also unlikely to succeed in arguing that trial counsel's related cross-examination was unreasonable. See, e.g., *Velasco* v. *Commissioner of Correction*, 119 Conn. App. 164, 172, 987 A.2d 1031 (attorney's line of questioning of witness clearly is tactical in nature and this court will not second-guess counsel's trial strategy), cert. denied, 297 Conn. 901, 994 A.2d 1289 (2010); see also *Ricardo R.* v. *Commissioner of Correction*, supra, 185 Conn. App. 802 ("[a]lthough the petitioner, with the benefit of hindsight, may now prefer that trial counsel had undermined [the witness'] testimony . . . he fails to sufficiently demonstrate how the line of questioning [trial counsel] actually pursued was not part of a sound trial strategy, or how it fell outside the range of competence displayed by lawyers with ordinary training and skill in the criminal law").[13]

In summary, we conclude that the habeas court properly determined that the petitioner failed to demonstrate that Meredith's performance was deficient. In reaching this decision, we stress that "[c]ompetent representation is not to be equated with perfection." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 218, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017).

Consequently, we further conclude that the petitioner has failed to show that his claim of ineffective assistance of counsel involves issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the issues are adequate to deserve encouragement to proceed further. Thus, the habeas court did not abuse its discretion in denying the petition for certification to appeal with respect to these claims.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The additional claims asserted in the habeas petition were deemed abandoned by the habeas court, and the petitioner has not challenged that ruling on appeal.

[2] In the present case, the habeas court concluded that the petitioner had failed to establish that Meredith rendered deficient performance and did not address the issue of prejudice. See, e.g., *Charles* v. *Commissioner of Correction*, 206 Conn. App. 341, 346–47, 261 A.3d 184 (trial court need not address both prongs of test set forth in *Strickland* v. *Washington*, supra, 466 U.S. 687, when denying habeas petition), cert. denied, 339 Conn. 919, 262 A.3d 139 (2021).

[3] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, *with intent to cause the death of another person,* he causes the death of such person . . . ." (Emphasis added.)

[4] This "temporal distance" refers to the fact that the punches at the salon parking lot occurred in the early evening before the petitioner and the victim went to Flores' apartment.

[5] As noted previously, Carver testified about three possible scenarios that could have occurred "following the infliction of the [victim's] head trauma, if it was the head trauma that caused her death: (1) the [victim would] not immediately lose consciousness but [would lose] consciousness later; (2) the [victim would lose] consciousness, [regain] consciousness and [lapse] back into unconsciousness as the swelling and blood accumulation accrued; or (3) the [victim would become] unconscious immediately and . . . not wake up."

[6] In his appellate brief, the petitioner argues that Meredith's omission of the "two punch theory" constituted deficient representation, for it was "the best available defense." At oral argument before this court, the petitioner readily conceded that Meredith did develop and implement a lack of intent strategy at trial, but he continued to argue that Meredith's performance was deficient nonetheless because the "two punch scenario" was "absolutely" and "by far" the "best" theory of defense.

[7] The additional evidence includes, but is not limited to, the fact that there were two equally plausible causes of death; the petitioner's statements to the police, in which he stated that he choked and hit the victim frequently, had done so on the night in question, and that he believed the victim died from suffocation; and the lack of any conclusive time of death.

[8] Moreover, it was undeniably reasonable, if not critical, for Meredith to formulate a strategy that accounted for the petitioner's version of events, which the jury was exposed to through the admission into evidence of his statement to the police that he had choked the victim. See *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 262, 257 A.3d 423 ("[w]e agree with the habeas court's skepticism as to whether it could ever be objectively deficient performance for defense counsel to use available facts, especially the client's own story, to offer the jury information that, if accepted, would result in an acquittal on the most serious charge" (internal quotation marks omitted)), cert. denied, 338 Conn. 909, 258 A.3d 1279 (2021).

[9] The habeas court noted that Carlow had acknowledged that "it is common for defense lawyers to differ on theories of defense and how to pursue them." As stated previously, our Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 637.

[10] The petitioner also argues that the "two punch theory" was critical because the state's witnesses corroborated this theory. We do not find this argument to be compelling. Although we recognize that there is a utility in

using the state's witnesses to form a defense, it does not render the failure to do so deficient performance. See *Harrington* v. *Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("[r]are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach").

[11] The petitioner argued that Meredith "had no idea" as to the amount of time that elapsed between the infliction of a fatal neck compression injury and death, that he "did not understand" whether a person could experience a lucid moment following a neck compression, and that he had "no idea" whether he ever understood the difference between a period of survival following a head trauma versus a neck compression. However, we emphasize that Meredith testified that he *could not recall* if he had knowledge of such information at the time of the criminal trial, nearly ten years prior. Carlow acknowledged at the habeas trial that Meredith "did not testify that he did not understand the medical testimony or issues in the petitioner's criminal case." We iterate that the habeas court expressly credited Meredith's testimony.

[12] Our conclusion is supported by the habeas court's statement that Carlow "opined that trial counsel failed to explore the medical science *in order to utilize a stronger theory of defense* in the petitioner's case." (Emphasis added.) We emphasize that the standard for determining whether an attorney's strategy was constitutionally deficient is whether it was objectively reasonable considering all of the circumstances. See, e.g., *Meletrich* v. *Commissioner of Correction*, supra, 178 Conn. App. 277–78.

[13] The petitioner also argued that Meredith was deficient in failing to object to the admission of spermatozoa evidence found on the victim. After conducting a thorough review of the record, we conclude that this argument lacks merit. At the habeas trial, Meredith testified that he viewed this evidence as having beneficial value to his theory of defense because the presence of spermatozoa indicated that the petitioner and the victim had sexual intercourse that evening, which supported the petitioner's statement that she was alive at that time and was consistent with the normal course of their contentious relationship. Indulging in a strong presumption in favor of the adequacy of trial counsel's performance, as we are required to do, we conclude that the petitioner has failed to show that this decision was not sound trial strategy.

——————————————————